May it please the Court. My name is Chuck Madwell. I represent plaintiffs' appellants in this matter. They're the individual non-Indian owners of fee property and an association of such owners whose members reside in and own property within the historic boundaries of the Port Madison Reservation in Kitsap County, Washington. With me is my co-counsel, Dennis Reynolds, and also here in the first two rows to your right are the plaintiffs' representatives. Fundamentally, this is a dispute involving the ability of non-members to know where tribal jurisdiction begins and where it ends. In the words of Justice Souter, a matter of real practical consequence, particularly under the facts of this case. This is no hypothetical dispute. The plaintiffs claim that large portions of the Port Madison Reservation have been diminished and that the tribal defendants, with the support of the federal agency defendants, are unlawfully asserting tribal jurisdiction and authority over these lands and the residents therein. The tribal and federal agency defendants, on the other hand, claim that all areas within the historic boundaries of the Port Madison Reservation constitute Indian country over which the Suquamish tribe has jurisdiction and sovereignty. The district court refused to allow this case to proceed to trial on the merits of dismissing it without prejudice on a 12b1 motion for lack of Article III standing. And standing is primarily the issue here. It was well briefed, I think, thoroughly briefed by the parties. But we would like to concentrate our argument today on a couple of concerns that we have with the district court's ruling. First, the court's holding that apparently that there was, even though there was harm to the plaintiffs from tribal enforcement of the laws, there was not enough harm to justify the relief sought by plaintiffs. And second, the court's holding that the causation and redressability prongs of the standing test could not be met because the State and county were not parties to the litigation. As to the first, the court, while acknowledging the evidence of concrete injury to plaintiffs, concluded that it was not sufficient to justify the sort of sweeping prospective relief that the plaintiffs request. In other words, according to the court, plaintiffs have been harmed, but not enough. There's been enforcement of tribal laws, but not enough. And if the court, if the district court has created a new standard here, and we think the court has, we think it's a dangerous one for invites in cases such as these, additional conflict and confrontation as opposed to early resolution of disputes consistent with the purposes of the declaratory judgment. It's also inconsistent with established law. Here, the plaintiffs meet the articulated standards for Article III standing, we believe. They have alleged specific instances of concrete injury from the actions of the defendants that are redressable, and case law requires no more. Actually, the plaintiffs have done more here. They have not just alleged concrete injury or imminent threat of injury from the unlawful exercise of this authority. They have produced unrebutted evidence of that. This evidence includes repeated and recent traffic stops by plaintiffs, by armed tribal police on county roads, issuance, and in some cases, issuance of tribal traffic tickets. Some of these unlawful stops have occurred since the filing of the lawsuit. There have been unwanted responses by tribal police to emergency calls from non-Indian-owned land or property owners on non-Indian-owned lands, fee lands, and in one case, this even resulted in the search of one of the plaintiffs' homes by a tribal officer and the handcuffing of the plaintiff's son by the tribal officer. And importantly, it includes a tribal development, a housing development, on fee-owned land adjacent to the plaintiff's properties that could not be developed anywhere near its intensity or scale if it were but for the fact, if it were under State and local law and outside the boundaries of the reservation. So these are not speculative. Kennedy. Pause. You've gone through this laundry list, but as I recall the laundry list, it wasn't quite the same as you related it. So let's take the search, for example. It was my understanding, and I'm rummaging through, so you certainly know the case better than I do. The search was actually conducted by officers from the sheriff's department. Is that correct? Verrilli, Jr. With the tribal police there. Kennedy. Well, but the sheriff, you have no dispute that the sheriff has the authority to conduct a search. Verrilli, Jr. Yes. That's correct. But we contend that but for the fact that the tribe and the federal government considers these to be reservation lands, tribal police answer these calls. They answer the 911 calls. They show up. There's a potential. Kennedy. But the example you give us, I mean, it isn't simply this past history we're concerned about. You're seeking perspective relief, and what you have to demonstrate is a real concrete reason to believe that there's going to be a problem, there's a danger. The illustrations offered up, well, you've identified one was this search, but it turns out the search was done by the sheriff, who unquestionably has authority whether the land is within the reservation or not. So that turns out not really to be, to me, much of an example of a concrete danger that justifies the case proceeding. The traffic stops, you said, I think there were numerous and recent. As I went through, I frankly didn't count that many. Now, this isn't a challenge to the jurisdiction of some effort to prosecute based on one of those stops. This is something that says in the future there's no jurisdiction. That's a much different question. So I think the district court was not unfair in saying, and not beyond the law in saying, look, there has to be some concrete danger of something that's going to be enforced, and we need to have enough reason to think there's a case there to justify this going on, to justify standing. Well, the risk, understanding, is the risk of harm, the risk of injury. And here there is the risk is this, that every time the plaintiffs get in their car and drive somewhere, on lands that they allege are outside the reservation boundaries, they don't know who's going to stop them. They don't know if it's going to be tribal police. Perhaps they can hope they're not going to be stopped at all. But the point is there's that risk, and this is why they have a right to know where tribal jurisdiction begins and ends. And also, for example, when they call 911, they need to know who's going to be answering that call. Is it going to be the officials to whom or for whom they've paid taxes, or is it going to be tribal officials? And you have the potential for conflict when you have, for example, a tribal police officer stopping a non-Indian resident who believes that tribal police officer has no authority to stop them. You've got a great potential for conflict, and you also put that individual to a Hobson's choice. Do you object to, you know, the jurisdiction of an armed police officer, or do you risk getting a ticket or being arrested or more? I mean, that's the issue that, I mean, that's the harm that we're looking at here. If that occurs, can't that individual raise all these issues that you're raising now as a defense to the traffic violation? But where? I mean, if you're issued a tribal ticket in tribal court, and we assert the tribal court has no jurisdiction. You have a right to come over to the district court if you're treated improperly in the tribal court. Well, we believe that the plaintiff should not be put into that position, and that they're harmed by being put into that position. And as per the process, there would be an immediate injury. Yes, there could be. It's a question of standing to raise these issues. Yes, you've got a potential conflict there that's caused by our claims here that the tribe is unlawfully asserting jurisdiction. And then let's look at the tribe, let's look at the housing development. There's no question but for the fact that the tribe and Federal Government assert that that land is within the historic or is within the boundaries of a reservation, that development would not be able to go in there at that density. Why wouldn't it be able to go in there? Because it violates local zoning laws. It violates the State Growth Management Act. Can the county prosecute? Well, the county can, but that was the second ground that the court held. Private citizens can't prosecute zoning violations. But the question here is whether they've been harmed from that. We're talking about standing, and we're talking about have they been harmed by a development, an unlawful development that goes in next to their property that will have adverse impacts on their property? Yes, they have been. That's really the issue we're looking at here, standing, injury that's fairly traceable to the actions of the defendants. And here it's not the county that's allowing that. It's not the county that's doing anything, perhaps the county doing nothing, but my clients can't control that. It is the tribal officials with the concurrence and support and recognition of the federal agency defendants that are allowing that. And in our opinion, those are concrete issues. I mean, you're assuming county enforcement. He's saying if this tribal issue, the reservation issue was out, you're assuming the county would enforce. By default, they have to. Then why shouldn't we assume, and if the county wants to enforce, it will enforce? Well, because of the tribal assertion of jurisdiction and because of the federal agency statements and positions to the state and local government that this is within the boundaries of the reservation, the county has backed off. For years, the state and county did exercise jurisdiction, but now they've backed off because of the unlawful actions. of the tribal officials and the federal agency defendants. And so this is why, to us, the lower court's ruling is disturbing, because we think that there is harm. There are these potentials for conflict, or there are these conflicts. But, you know, what should we advise our clients to do, since this was dismissed without prejudice, to refile this action? What should they do to obtain standing? What can they do? Should they invite more conflicts or confrontations with tribal authorities? Should they violate laws in order to have them enforced against them? How many of these developments on land that are not zoned for these types of uses should they have to endure? And what can they do about it? I mean, this is their family's law. Perhaps as many as the county will let them endure. It seems to me the county is the party that properly can complain. I have to admit, I have some difficulty with the notion that private citizens can come in and call upon us to make the assumption the county would act but for. And that's something for the county to speak to. Well, whether the county will get involved is a political matter. We can't force the county to get involved. I mean, I suppose that's a problem. But that shouldn't be. But that's a problem with us, too, because we can't assume, I don't think, that the county would act but for this reservation question. Well, the county would have to act, let me put it that way. For example, until recently, the state enforced the environmental laws on the reservation. Under the assumption, everyone's assumption, that the reservation was substantially less than what now it's proposed to be. And that on those lands that were non-Indian-owned fee lands, the state and local government had a jurisdiction, and the state was able to exercise its delegated enforcement authority over that. That's been taken away by the federal government because of its change in position now, that the extent of the reservation boundaries go to the historic reservation boundaries. It was assumed, I think, by state and local government. It's not the case. And once that happens, the state and local government backs off. Once the federal government says, this is a reservation, you know, or the extent of the reservation goes to the historic boundaries, what is the state to do? I mean, are we saying that the only way this can get resolved is if we can get the state and local government to sue the federal government? And we don't think it – well, we can't force them to do that, but we think that still the plaintiffs here have been injured by these actions, and that they're fairly traceable, or they're caused by the actions of the federal government and the tribal defendants, and they should be able to litigate these. They see no other remedy. And I think that's what declaratory judgments are for. And it says any person. Let me take a different context, and I freely confess I know nothing about Washington State law in this field. Suppose no reservation issue at all. Somebody's building a condominium or apartment building. Neighbors don't like it, think it's in violation of the housing code. Do they have standing in some Washington State court proceeding to assert the housing code as a private citizen? Absolutely. This is the problem. This is my clients, and I think the district court even said it was development without representation. That's how the court looked at the issue. That's how we look at the issue. Why shouldn't your clients do exactly that, which is assert the housing code violations, which they apparently can in Washington State court? We can't. We have nothing. Well, see, because the development is going in without any county oversight. No. Typically what would happen. But what I'm saying is either the county can act to oversee, or if you're telling me privates, and if they do, there's clearly going to be standing. Or if private citizens can act instead of the county, the private citizens can take that action. But what we have here is a much more theoretical, broad, prospective determination without those concrete, individualized, particularized episodes that standing seems to, as a matter of law, requires. Well, no. I think I would say it a little differently. You have county oversight. We think there should be county oversight in jurisdiction, because these are not reservation lands. But because the tribe is saying these are reservation lands, and so is the federal government, now there's tribal and federal oversight, not county oversight. And that's the problem. This development is going in without any county permits, without any county oversight, and there's no ability for plaintiffs to be able to challenge that, except in this forum, which is why they're here. I see that I only have less than five minutes left, so I'll leave the remainder for rebuttal. Thank you. Thank you. Good morning, Your Honors. There are two defendants. We have each reserved ten minutes for argument. May it please the Court, my name is Michelle Hansen. The time is put together. How the two of you choose to divide it up will depend upon. How we decide to do it. How you decide to do it. So you'll have the 20 minutes. What's left, your colleague will get. Okay. That sounds great. Thank you. My name is Michelle Hansen. I am a tribal attorney with the Suquamish Tribe, a federally recognized Indian tribe. I represent the tribal appellees who have been sued individually and in their official capacities as members of the Suquamish Tribal Council. Appellees Benny Armstrong, Linda Holt, and Robert Purser continue to serve on the Council presently. Appellees Leonard Forsman, Kevin George, Charlie Seigel, and Wayne George do not serve on the Council now. I will refer to all of these appellees as the tribal appellees. I will refer to the association of the individual appellants as the apportment. The Court is correct, and I think that Judge Burgess said so recently on the issue of what the county can do. And Judge Burgess said in his order dismissing the case that the county and the state do not need to roll over and die. They're quite capable of making decisions, and that, frankly, a lot of the facts stated here are based on third parties that were not before Judge Burgess' court. Judge Burgess correctly dismissed Apportma's lawsuit on the ground that Apportma failed to establish a case or controversy. And for the reasons I'll discuss shortly, this Court should affirm that dismissal. And based on one or more affirmative defenses that I will also discuss, this Court should dismiss that lawsuit with prejudice. This Court's review of the dismissal is de novo, and the Court may affirm the District Court's dismissal on any grounds that are supported by the record. After thoroughly reviewing Apportma's complaints and affidavits, Judge Burgess … The appellees are asking for an affirmance of the dismissal, but in addition … That's not the same thing. I mean, if we affirm the dismissals plainly, explicitly, without prejudice, you're asking us to do something other than to affirm. You're asking us to grant you a dismissal with prejudice, which is something other than the District Court did. I don't think that can be called affirm. Okay. I believe that this Court can review jurisdictional issues de novo, and that it can, in fact, reach the affirmative defenses because of, well, in the interest of justice and in the interest of conserving judicial resources, because if it is affirmed only and the new case is brought, then we will be back before this Court on those same absolute defenses to the suit. As a matter of law, Judge Burgess concluded that it is simply not the case that a whole lot of nothing necessarily amounts to something. And Judge Burgess found that Plaintiff's complaint nowhere alleges that the tribal council or the tribal appellees, the individual members, have ever attempted to exercise jurisdiction over Apportma or their property, and that Apportma's claimed injuries were too conjectural and too dependent on the actions of third parties, such as the county and the State, that were not before the Court to actually present a case or controversy. And I think this is the discussion you were having with Mr. Madwell. It does not support an actual case or controversy, and it does not justify the sort of sweeping prospective relief that Apportma requests. Do you accept the proposition that the plaintiffs have reason to want to know the answer to the question they're trying to litigate? The answer is already in place, Your Honor. This Court, in 1990, in a quiet title action entitled United States and Suquamish Tribe v. AIM, already addressed and definitively defined the exterior boundaries of the Port Madison Indian Reservation. In AIM, and I want to quote the Court, the Treaty of Port Elliott, signed January 22, 1855, created the Port Madison Indian Reservation on behalf of the Suquamish, Duwamish, and other allied Indians. As enlarged by the order of the Secretary of the Interior in 1864, the reservation contained over 7,000 acres of land bordering Puget Sound and abutting nearly 11 miles of tidelands. Although the location and size of the reservation has not changed since 1864, much of the land in the reservation was allotted to individual Indians during the 1880s and eventually transferred to non-Indians. Non-Indians owned waterfront land within the reservation and possessed corresponding deeds to the abutting tidelands conveyed by the state. That's the end quote. This is at 887 FedSecond on page 192. This court affirmed Judge Johnson's determination that the high watermark of the Puget Sound constituted the boundary of the Port Madison Indian Reservation and the tidelands were therefore not part of the reservation. The property at issue in that case and the property at issue here is exactly the same. The ultimate question of law defining the exterior boundaries of the Port Madison Indian Reservation was exactly the same. Even the parties of the named parties, the United States, the Suquamish tribal government, William Whiteley, Virginia Whiteley, and the Portland members who own waterfront property on the reservation or any of their successors in interest are the same. Under these circumstances, the decision has already been made and stare decisis or reis judicata is an absolute defense to this instant lawsuit. Well, I take it none of that has anything to do with Judge Burgess's order, does it? You're basically saying you should win on the merits. Actually, it's a jurisdictional issue, Your Honor. I think it's reis judicata. Well, okay, you should win on reis judicata because it's been litigated. That's not what Judge Burgess ruled. That's correct. Judge Burgess, in the motion to dismiss, the both parties, both the tribes, tribal appellees, and the government appellees did raise this in the motion to dismiss, and Judge Burgess decided to take, you know, to dismiss on the issue of standing instead. He did not reach the issue of the affirmative defenses. But I think that it is of record, and I think this Court is authorized to review that. Did you discuss reis judicata in your brief? Your Honor, I did not raise it in my brief. Look, I discovered AIM. It was cited, although I thought it was cited for a different proposition, but I have to say the argument you've just articulated is one that catches me by surprise, and I'm wondering exactly what it's doing here if it's being offered up at oral argument for the first time, at least for our Court. It has been discussed at the lower court. I think that the basis of the lower court's decision. That's correct. But it was raised, and it was not addressed. I think that this Court can consider any jurisdictional matter, and I think that in this particular case, the AIM decision, which has been cited, is very clear on what it is. It is that the parties are asking for, and what it is, that's already been decided. And the — That may be, but it's awfully hard for me to absorb this if we don't even find it in the brief. Yes, I understand that, Your Honor. Because it's not the best time to try to raise an argument of that nature. I understand it, Your Honor. Well, this lawsuit is at a very early stage of litigation. Apportment has filed a complaint, an amended complaint, and a second amended complaint. And the affirmative defenses, nor any answers, have been formally filed. There are other absolute defenses to this lawsuit, and I believe that the Court should consider those as well here. And those were cited in the brief. They include the failure to state a claim upon which relief can be granted, sovereign immunity, and the failure and inability to join the Promised Tribe, which is a necessary and indispensable party to the suit. If there is no standing, how can we reach these defenses? I think that there are alternate reasons for dismissing the suit, and instead, without prejudice, with prejudice. But if the parties don't have standing to be here, is it our duty or the district court's duty to dismiss the suit? I think that the failure to state a claim upon which relief can be granted is a procedural dismissal. But if there is no jurisdiction, you can't reach the merits. Isn't that true? Yes. If there is no jurisdiction, then you would not reach the merits. The Court said there is no Article III jurisdiction here because of lack of standing. How can we reach the issues you're now raising for the first time? The tribal appellees agree that there is no standing because there is no case or controversy. But doesn't that end the case? Yes, Your Honor, and I would say that if that is this Court's desire to affirm on that basis. I'm not sure it is, but I'm just asking you, how can we reach the merits of the defenses if there's no standing? I think that also as a matter of subject matter jurisdiction, that there is no private right of action to diminish a reservation. And the apportment has not shown any cases. Judge Burgess found no cases, and he states that in his order. So there is also a failure to state a claim upon which relief can be granted. And I understand that he didn't raise that. The Supreme Court has told us if there is no jurisdiction, we cannot determine whether there are sufficient facts to state a claim. That's a different problem, only which can only be reached if there is subject matter jurisdiction and standing. And I think on a number of different bases, there is no subject matter jurisdiction or personal jurisdiction here in the first instance. I'd like to provide my colleagues with the remainder of the time. Thank you very much. May it please the Court. My name is Steve Mesquinas. I'm an attorney with the Department of Justice representing the federal defendants here, and my colleague, William Rudolph, is sitting at the table. We're asking the Court to affirm the district court's decision and dismiss this case for lack of standing because there's simply no case of controversy, especially with regard to the federal defendants. There's no case of controversy, first, because the federal defendants do not control the behaviors of the Suquamish Tribal Council in its decisions to enforce which regulations against whom on a day-to-day basis. And secondly, because none of the federal defendant agencies controls either the State or the county. None of the federal defendant agencies have posed or interposed a legal bar preventing either of them from asserting their rights if they feel the tribe is usurping its jurisdiction over their lands. I understand the arguments that the federal defendants aren't the actors here. Does that really speak to the standing of plaintiffs? It speaks to the standing of the plaintiffs. Against these defendants, perhaps. Are you saying anything more broadly with regard to the standing of plaintiffs as against the other defendants? Well, I don't think they have standing against any party, but I was going to just focus on the federal defendants. I don't believe that the three traffic citations issued over a span of 20 years is enough to show an imminent direct threat of injury from the Tribal Code. I'm sorry, from the Tribal Council. But I don't. But if there's no standing against the tribe, then there's certainly no standing against the federal defendants. The federal defendants, the plaintiffs, in order to create a case of controversy against them, have pointed to a number of things. With regard to the Environmental Protection Agency, they've referenced the court to a 1996 cooperative agreement which has the purpose of serving as a planning device to facilitate intergovernmental cooperation between the EPA and the tribe. Plaintiffs have alleged that this agreement is a vehicle for delegating enforcement to the tribe to enforce federal environmental law within the confines of the Port Madison Reservation. The agreement is nothing of the sort, and this can be seen if you simply look at it. It's simply a device to allow the tribe to identify its environmental resources within the confines of its reservation and to begin working with EPA to identify objectives to preserve and enhance those resources over time. And, in fact, the agreement on page 77 of the record, the fifth clause of the agreement states, entitled, The Effect of This Agreement, says, in no uncertain terms, quote, This agreement is intended solely to facilitate intergovernmental coordination between the parties and grants no rights in third parties nor any right of judicial review. This agreement is not intended as an enforcement document, and the tribe disclaims any responsibility to act as an enforcement agency. So under this agreement, there's no authority vested in the tribe to assume control of the and begin enforcing it within the context of the reservation. And by the same token, there's no grounds for an argument, then, that through this agreement there's an effect of the sort that because the EPA has given the tribe this type of authority, they've precluded the county or the state from exercising the same type of authority. Plaintiffs also point to a 1990 treatment as a state application that the tribe submitted to EPA. This application was accepted. It's a necessary prerequisite to enable the tribe to receive grant monies under the Clean Water Act's Water Quality Planning Grants Program. Again, however, this application does not vest in the tribe any authority to enforce a federal regulatory program within the confines of the reservation. Some of the programs that the grant monies have been used for can be identified in the record on pages 163 to 64, and they include a comprehensive water resource assessment to be undertaken with grant monies, delineation of the Fort Madison Water Resource Basin, outline of groundwater appropriation levels for the reservation, and outline of groundwater appropriation levels for the reservation's aquifer system. If the tribe were to desire to enforce or take ownership of a federal regulatory environmental program, they would have to file a separate application. EPA would once again have to assess the tribe's ability to undertake and control the whatever the specific program is, and then the agency action would be subject to notice and comment, and that could be the object of an agency review if the plaintiffs felt agreed by it. In this case, however, for purposes of standing, plaintiffs, in spite of pointing to these two agreements, have indicated no, have alleged no federal environmental laws have been enforced by any members of the tribe, and more importantly, they pointed to no members of the, no plaintiff who's been specifically, personally injured by the enforcement of such law. Secondly, with regard to, oh, come on, with regard to HUD with the 19, the 1999 grants, this, the injury to this that the plaintiffs seek as relief for this, diminishment of the reservation, but the reservation, the grants are given to the members of the tribes to develop low-income housing without regard to where the housing is built. In other words, it's no concern to HUD where they choose to build this, and if the court were to grant plaintiffs their relief, the housing grant could still go forward, and by vice versa, were this jurisdiction of an APA action and grant as relief, an overturning of the grants provided by HUD, the remedy would not be what the plaintiffs are asking for. It would simply, that would interfere with the provision of the grant monies. It would not interfere with the tribe's ability to assert jurisdiction on the parcel where the housing is done, or the tribe's ability to violate county ordinances by asserting that they have jurisdiction over it. And finally, with regard to the Department of the Interior, plaintiffs have identified no agency action at all which they claim to have agreed them, other than, and this is for all federal agencies, the fact that they have somehow encouraged or acquiesced in the tribal's assertion of jurisdiction. And I submit that all this really means is that the federal agencies are dealing with the Suquamish tribe as if it was a federally recognized Indian tribe, which in fact it is, and thus the federal agencies are, in fact, required to deal with the tribe as a sovereign government within the confines of its reservation. Thank you. Mr. Hanson, let me ask, you've got a few minutes remaining. Let me ask you a question, if I could. No, Ms. Hanson gets to come back. Assume that, and this is not to say that there's not merit to your argument, but let me go past the argument that you offered and go back to the issue raised by the district court's decision with regard to the plaintiff's standing to proceed. The plaintiffs clearly care enough about this to have gathered together, filed a lawsuit, gotten a lawyer, proceeded with the lawsuit on appeal after they failed in the district court. There's motivation there. They plainly have a desire to get this issue resolved somehow. How would you suggest they get it resolved? Is there a way they can get it resolved? There are three things that the apportment plaintiffs or the appellants would like, and this is what they've asked for the court to do. They want the court to tell the tribal police to stop making traffic stops on speeders, drunk drivers, if it turns out that those folks are apportment members or if they are non-Indians, on what they versus Washington versus Schmuck, and I can give you that side if you want it. The state supreme court said that the port or that the Suquamish tribe has an inherent authority to make traffic stops on public roads on the reservation in order to investigate either state or tribal violations of law or to detain people in order to get them to the proper apportment members and any other non-Indians on the public roads of the reservation. The other thing that they would like, and they have asked the court, is to tell the tribal police not to answer their 911 calls, but the tribal police have a duty to respond to 911 calls. For instance, in the example that was presented by the appellants, you may have a burglary call, but that with the sheriff, and that's why they're there. And finally, they are asking for this court to diminish the Port Madison Indian Reservation, and there just isn't any private action that allows for that. So if they want to resolve the issue, they need to come to terms with the fact that they live on an Indian reservation, that it is very complex as far as not the boundaries being complex, but the fact that there are four different governments that might and could have jurisdiction over a particular situation because of who the people are, whether the land is in trust or fee, and they just have to deal with the reality of that. It is not a situation where we can sit down and say, all right, we won't answer your 911 calls, because there are other non-Indians who live on the reservation that definitely want the police to be there as soon as possible. Thank you. Thank you. Your Honor, Ms. Hansen answered our question as to why we need this lawsuit. What Ms. Hansen essentially said is how do you resolve this issue? Well, first of all, we are part of a reservation, and therefore Indian country, and therefore we can make the traffic stops, we can answer the 911 calls, and we can put our development anywhere we please so long as we own the property. Your answer was really, you are going to lose on the merits, and I should have anticipated that answer. It doesn't address the standing issue raised in Judge Burgess's order. It's a fair answer. But it comes back to your case requiring at a later stage, if you get that far, to prove up on the merits that there is a cause of action in there someplace, and I can understand why she's not in a position to concede that or want to give ground on that. Returning to the standing issue, we've already raised the hard question, I think, with you. Is there the kind of concrete, particularized concern that justifies standing? Yes. And one other thing, this is why we're concerned about, we think there is that concrete injury, and if we need more, we're afraid that more is just more confrontation, because my clients don't see a way out here. But when you're talking about harm, you're talking about a violation of tribal law. These are personal rights. The county has no standing over those, and that is concrete harm. And if we were able to do discovery, we had that opportunity, we'd probably find a lot more of these. But all of those stops are premised on the belief and the determination by the federal government, by the way, which is a change in their position, that the historic boundaries of the reservation are in fact the boundaries of the reservation. So there is this harm, there's this continuum of harm, and we're talking about personal rights and vindication of personal rights. Courts have allowed cases to proceed on far less of a connection or a nexus between a claimed injury and the action that's being challenged. And we just want that opportunity. The threat of injury. Yes. Well, there's the threat of injury, and from my client's perspective, there has been injury. They have been stopped when they believe they should not have been stopped because it was outside the reservation boundaries. No issue was raised as past injuries. You're talking about the threat of future injuries. Yes. And there were three or four stops we're talking about within the last three years. Two of them, one of them since the lawsuit has been As for the issue of res judicata, the issue of the state versus OM, I don't think I should have to get into that. I can answer that. But the extent of the boundaries of the reservation have never been reached by a court. Those cases, OM, and there's some other cases that reach different issues, like the right to ownership of tidelands and issues like that. But they did not reach the reservation issue. Regarding what the federal agency defendants are alleging, they're pretty much saying, well, we haven't done anything. Well, first of all, they approved the Constitution of the tribe and their bylaws. And at that time, they told the tribe, your Constitution and bylaws cannot include non-Indian-owned fee lands or non-members. And they've changed their position on that. And if we can get the trial on this, we can prove that the position of the federal government back then was that the reservation had been diminished by the issuance and sale of the allocations and also by the sale of what we have called the military strip to the federal government. And there is session language in there. And so whether the Usher Declaration in 1864 properly established the boundaries of the reservation, well, that may be an issue. But this is a diminishment case. We're saying since then the reservation, the boundaries of the reservation have been diminished. And I think based on the actions of the tribe and the federal government, what they have been doing, based on those determinations, has been harming my clients. And again, they don't know when they get in their car, they'll get a half gallon of milk at the store. They don't know who's going to stop them and who can stop them. When they call 911, again, they don't know who's going to answer and who will show up. There's a potential for conflict and confrontation. This is something that ought to be resolved. And on the issue of development, when you buy a piece of property, I think one of the things you want to know is not only what development is allowed on your piece of property, but what can your neighbor do? And this is one of the big problems that our clients are having, especially with the housing project, is that it's on fee-owned lands, not owned by the tribe. The federal government gave money for that particular development. It would never be allowed under the comprehensive land use plan and zoning under the county. It's not appropriate in what is a rural residential area. There's harm there. And the construction is proceeding without any county oversight because the position taken by the federal government in funding that project and the position taken by the tribal officials is you have no jurisdiction. And we can't expire it. We thank all counsel for their argument, and the case is submitted. Thank you.
judges: Browning, Alarcon, Clifton